SADIE WESTENDORF, Appellee, v. AMBY G. WESTENDORF et al.,
Appellants.

CONTRACTS: Rescission or Abandonment—Presumption from Sig-
1  nature. Ordinarily, one who has full opportunity to read and
know the contents of a written contract before signing the same
is, in the absence of fraud inducing its execution, conclusively
bound by his signature.

ADOPTION: Signature Induced by Mistake—Effect. Notwithstand-
2  ing the neglect of the mother of a child in failing to read and
note the contents of adoption papers signed by her, giving up
the child's custody to her mother-in-law, if she were prevented
from so doing by legitimate inferences drawn by her from her
husband's letter, that the child would be returned to her after
a time, and by the confidential relations among all the parties,
she would not be bound by her signature.

ADOPTION: Custody of Child—Child's Welfare Paramount. Evi-
3  dence reviewed, in an action where adoption papers, given by
a young mother to her mother-in-law, were canceled, and the
custody of the child returned to its mother, and held sufficient
to show the same to be in furtherance of the interest and wel-
fare of the child, which is a paramount consideration in such
cases.

APPEAL AND ERROR: Questions of Fact, Verdicts, and Findings
4  —Findings of Trial Court. While a suit in equity to cancel
adoption papers is triable de novo in the Supreme Court, yet
the finding of the trial court therein is entitled to considerable
weight.

*Appeal from Lyon District Court.*—WILLIAM HUTCHINSON,
Judge.

OCTOBER 25, 1919.

SUIT in equity for the cancellation of adoption papers
which plaintiff alleges she was induced to sign by fraud.
There was a decree in the court below, canceling the agree-
ment and ordering the child returned to plaintiff.—*Af-
firmed.*

S. D. Riniker, for appellants.

E. C. Roach, for appellee.

STEVENS, J.—Plaintiff is a young woman 23 or 24 years of age, the mother of the defendant Norval James Westendorf, who was about 2½ years of age, at the time of the trial. The defendant Amby G. Westendorf is her former husband, and the defendant Mamie Westendorf, his mother.

On June 4, 1917, plaintiff signed papers of adoption, giving Norval to Mamie Westendorf unconditionally. She now brings this action to cancel and set aside the instrument, and in her petition alleges that she was induced by the false and fraudulent representations and promises of defendants to sign the adoption agreement; and that she did not, at the time, know or understand the contents or purport thereof, but believed and understood she was giving her mother-in-law custody and control of the child only until such time as she and her husband were able to provide a home for its proper care and rearing.

At the time the adoption papers were signed, and Norval delivered by plaintiff to the defendant, she was residing on a farm near Mitchell, South Dakota, with her parents, and the defendants were residents of Lyon County, Iowa, except that Mamie Westendorf claims Ida Grove as her home. Prior to her marriage, and since her separation from her husband, plaintiff, who is a native of Denmark, worked as a domestic in private homes, hotels, and restaurants, and, at the time of the trial, was employed as a servant in the Lyon Hotel, at Rock Rapids, Iowa, receiving $8.50 per week for her services. Plaintiff resided with her husband in Dakota until 1917, when they moved to Lyon County in this state, where they finally separated, as plaintiff claims, for the reason that they had no place to live. While the record does not otherwise disclose this fact, the court in its decree stated that plaintiff was served with original

notice, on September 7, 1917, of a suit brought by defendant in Lyon County for divorce. Plaintiff appeared and filed a cross-petition, and was granted a divorce thereon, together with $200 alimony, which was paid to her in cash. A few weeks thereafter, her divorced husband married, and, at the time of the trial of this case, was living in Rock Rapids with his wife, his mother and Norval living with them. Plaintiff testified that she knew nothing of her husband's intention to apply for divorce until after she signed the adoption instrument, and shortly before suit was commenced therefor. The grounds alleged in plaintiff's petition for divorce were cruel and inhuman treatment, but the record does not show the grounds on which the cross-petition was based.

Amby Westendorf is impecunious, and it is claimed that, for some reason, his mother has declared her intention to disinherit him. Some time before the adoption papers were signed, Mamie Westendorf was divorced from her husband, since which time, until the remarriage of Amby, she has apparently made her home with her mother at Ida Grove, Iowa. She is the owner of three race horses, and plaintiff claims that she follows up the races after the fashion of the owners of horses of this kind. This, defendant denies, but she admits ownership of the horses, and that they have proven somewhat profitable to her. She was formerly in the millinery business. She is the owner of a half section in Dakota, the value of which was estimated by her former husband, who was called as a witness in her behalf, at $65 per acre. Her horses were valued at from $600 to $1,000 each. She claims that her mother is worth approximately $100,000, and that she and her brother are her sole heirs at law. One of the claims of defendant, therefore, is that, by the adoption of Norval, he is placed in a position to inherit considerable wealth from the defendant.

The negotiations leading up to the delivery of Norval

to the defendant Mamie Westendorf were carried on between the plaintiff and Amby Westendorf, her husband. Mamie testified that she wrote plaintiff one letter, the contents of which are not shown. On May 9, 1917, Amby Westendorf wrote his wife as follows:

"Rock Rapids, Iowa, May 9, 1917.

"Dear Sadie and Little Son:

"Well I got your letter today, well you say you are going to work what are you going to do with little Norval. You sure dont think you can keep yourself and little Norval on $5.00 a week. You dont have to go out to work. I thought you went to visit your friends. But if you want to go to work so bad I will write to mama and let her take care of little Norval as I wouldn't stand for you taking him with you out to work so if you have to go to work let me know and I will have her take care of little Norval. You say I dont love you because I dont come to see you I think you know I have to work. Norval wont let me off as we are two busy we have 22 head of horses so you see we have something to do and besides you know it would cost me about $25.00 to come there you dont. I cant stand that as we will need money to live on next winter. Norval and I may be down to Mt. Vernon when they have the Old Settlers Picnic and race Amby W. and some of the other horses there. Will ring off for this time. As ever yours

"Amby W."

Plaintiff evidently replied to this letter, but neither the letter nor contents were offered in evidence. Again, on May 14th, Amby wrote his wife as follows:

"Rock Rapids, Iowa, May 14, 1917.

"Dear Sadie: I got your letter and sure glad to hear from you. You said that I have been getting letters from my mother. Well, Sadie you have fixed it that bad that I never will get letters from her but I am sure that she would be willing to take care of baby for you know how

she loved him and she has disinherit me that is she made a will the time she was sick at Sioux Falls and all she willed to me was $5.00. Just enough so I cant brake the will. I will never get another dollar from her as long as I live and I will have to pay her every cent I owe her but I cant blame her she was cruely treated and I know it and so do you so I thought if she would take baby and she would have him he would have everything his heart desires a good education and have all the money and everything she owns after she is dead for I know she will keep her word. She will never give me another cent. Norval got a letter from her and she said she was about to buy a home and that she was a going to adopt a baby out of the Orphans home, that is the reason I mentioned that we as her to take baby I am almost sure she will take him if we ask her to but she would never ask for him. So Sadie we better let her take baby so he will get her money as he sure will need it as I always will be a poor man so I think it best we let her take baby what do you think about it dont you think that I am right now let me know what you think about it in your next letter. And about you working out I dont like it but what am I to do I have been looking all over town to see if I could get a house or room but I just cant find a room even for a few days there are so many section hands and men working on the street that every thing is full so you see there wouldn't be no place for you to stay if you did come through here going to Lesterville the only way I see is for you to go on there to work if you think you must and I will watch out and try and get some one to work in my place and I will come there to see you if I possibly can. I would love to see you and little Norval but just couldnt find any one to work in my place. * * * Well I will close for this time hope this finds you and little Norval well and happy I am as ever, Amby W.

"Write at once and we better let Mama take little Nor-

val as his dad hasent got a home for him yet. Love and kisses to you and little Norval."

On May 27th, plaintiff wrote the defendant:

"May 24, 1918. Dear Amby: I have thought it all over; your mother can have little Norval but she will have to come to Mitchell a few days and stay so Norval can get used to her. Just to take him from me to her would be too hard on him. She can write to me what day she will be there, then she can meet me at the depot there, I can stay there with her a few days and I will go from there to work; so you write to me and let her write too. I hope Amby you will think over what I have done for you; I have done more than any woman would do. Dear little Norval just thinks the world of me. I hope you will be a little better to me than you have been, and you just have to send me some money as I have not a cent and I got to have shoes and money to go to work. Lots of love from your Sadie and little Norval.

"Postscript: Do you think now that I have done anything for you; it was sure hard for me to do it so Amby please send me a good word if you think a little of me but I don't believe you do. If your mother wants me to take Norval to Sioux Falls I can do so and stay with her a few days there. Amby why don't you send me some money, I have asked for this so many times. You know that I have not got a cent."

There was also one conversation between plaintiff and her husband over the long distance telephone regarding the matter. Plaintiff met the defendant Mamie Westendorf in Mitchell, South Dakota, on June 4, 1917, as agreed; and on the following morning, the latter left Mitchell with Norval for Rock Rapids. The adoption papers were prepared and signed by Amby at Rock Rapids, and taken by Mamie to Mitchell, where they were also signed and acknowledged by the plaintiff. Concerning the transaction at Mitchell, we

have only the, testimony of the principals, which is very conflicting. Plaintiff testified that she plainly stated to the defendant, and that such was the agreement and understanding of both, that she could have Norval for a little while, and only until suitable arrangements could be made by her for his proper care and keeping; that the thought of giving him to defendant permanently had not occurred to her; and that nothing was said about adoption papers. She admits, however, that she signed the instrument in question in the presence of a notary public. She further testified that defendant met her at a cafe, as previously arranged between herself and husband; that defendant came to her room and produced the adoption papers, which she laid on the bed; and that she referred to them as papers to be signed. Defendant said that she handed the instrument to plaintiff, saying "Here are the adoption papers." Immediately after the papers were produced, defendant left the room, in response to a long distance telephone call, and did not return for several minutes. Plaintiff says the papers were left on the bed, and that she did not examine or read them, and that, at the time of signing, she was ignorant of the contents thereof. While plaintiff was born in Denmark, and never attended school in this country, she was able to write, read, and speak the English language. There is nothing in the record indicating that defendant made false statements as to the contents or purport of the instrument to plaintiff, and it affirmatively appears that nothing was done by her to prevent the latter from familiarizing herself therewith. The relations between plaintiff and Mamie Westendorf, so far as appears from the record, were friendly and agreeable. The court below, in a finding of facts, sustained plaintiff's claim of fraud, and held that she signed the instrument without knowledge of its contents or legal effect.

While plaintiff and her husband were living apart, it

is manifest, from the letters introduced and copied above, that plaintiff did not understand that her husband regarded the separation as permanent. He did, however, as above stated, in a few weeks after Norval was turned over to his mother, commence divorce proceedings, and, a few days after the decree was entered on the cross-petition, marry another woman.

The statement in the letter of May 14th that, if Norval was left with his mother, he would be given everything he desired, a good education, and, as an inheritance, all the property possessed by her at her death, would seem to contemplate something more than a mere temporary provision for him. The letter, however, closed with these words:

"Write at once and we better let Mama take little Norval as his dad has not got a home for him *yet*. Love and kisses to you and little Norval."

This language was doubtless intended to impress plaintiff with the belief that the writer hoped some time to provide a home for his family, and it may not have occurred to her that Norval was not to have his proper place therein. The reference in the letter to the adoption of a child from an orphans' home should be given little probative force, as nothing further appears in the record indicating that his mother had ever thought of adopting a child from the home. There is little in plaintiff's letter of May 27th, even upon critical analysis, that is inconsistent with her testimony upon the witness stand, which was unshaken by cross-examination.

B. Westendorf, the divorced husband of Mamie, testified that plaintiff told him, in May or June, 1917, that she intended to "adopt Norval to" her husband's mother, and

that he advised her not to do so. This witness resides in Illinois, and, at the time of the trial, was stopping at the home of Amby, where his former wife was living. Plaintiff denies the testimony of this witness, and asserts that she told him she was going to let Mamie have him for a little while. Testimony of several friends and neighbors of the defendant was offered, to show that Norval is being well cared for by his adopted mother.

*1. CONTRACTS: rescission or abandonment: presumption from signature.*

If the above correspondence may be relied upon as showing the true relation between plaintiff and her husband, then it must be conceded that she had a right to repose full confidence in him; and, as all the negotiations concerning Norval were carried on by Amby, it can hardly be said that the plaintiff in the transaction, at Mitchell, South Dakota, dealt with defendant at arms' length. Ordinarily, one who has the ability and full opportunity to read and know the contents and effect of a written instrument before signing the same, in the absence of fraud inducing its execution, is conclusively bound by his signature thereto. *Pels v. Stevens*, 187 Iowa 443, and cases cited. Plaintiff did have such opportunity.

If she may legitimately have inferred from her husband's letters, together with the conversation over the long distance telephone, that he wanted her to let his mother have Norval temporarily, and only until he was able to reunite his family in a home, much substantial support of plaintiff's testimony is afforded thereby. If, on the other hand, he had divorce proceedings and remarriage in contemplation at the time, his motives were sinister, and what he did was well calculated to deceive and mislead the plaintiff. Although he was in Rock Rapids at the time of the trial, Amby was not called as a witness. The record is silent as to what passed between the defendants before the adoption papers were signed; but, as the negotiations were

carried on by Amby, Mamie may have known his real motives, whether good or otherwise, in inducing plaintiff to part with Norval. While the mere fact that Amby instituted divorce proceedings within three months after the foregoing letters were written, that decree was entered therein on December 11th, that he was married to his present wife in January, and that all of the parties were, at the time of the trial, residing together, is not alone sufficient to establish a concerted fraudulent purpose upon their part to get Norval, it is, nevertheless, somewhat significant in this connection.

Plaintiff was wholly without experience in business, evidently knew little or nothing of instruments in writing, their nature or legal effect, and would quite naturally believe that her husband and his mother intended to deal honestly and fairly with her.

.2. ADOPTION: signature induced by mistake: effect.

If there was a clear and perfect understanding between the parties that defendant was to take Norval only for a while, and that he was then to be returned to plaintiff, she would quite naturally, in dealing with parties sustaining the confidential relationship shown, be less vigilant than in dealing with a stranger. The letters we have quoted were well calculated to disarm her of any suspicions as to the good faith of her husband that she might possibly otherwise have had, and to create in her a feeling of confidence. If she is to be believed, her act in signing the adoption papers giving Norval permanently to the defendant, even if somewhat careless, was not wholly voluntary. She appears to have been a candid witness, and to have answered all questions directly; and her testimony, as shown in the record, is without a single material contradiction. If the understanding was, therefore, as she claims, the paper signed by her does not represent the real agreement between the parties; and, notwithstanding she neglected, when the opportunity was given her, to

read it, and thoroughly know its contents, if she was prevented from doing so because of legitimate inferences drawn by her from her husband's letters, and the close confidential relations existing between all of the parties, she should not be bound thereby. *Pels v. Stevens,* supra.

It is also earnestly and properly urged by counsel for appellant that paramount consideration must be given, in controversies of this character, to the interest and well-being of the child. It is no easy matter to

3. ADOPTION: custody of child: child's welfare paramount.

always correctly decide what is best for a child, under circumstances like those disclosed by the record. Plaintiff has no other property than the $200 received from her husband as alimony, and is without education or other accomplishments fitting her to earn a living, except by hard work. For the defendant, it is claimed that she has considerable property, and the probability of inheriting a much larger sum from her mother's estate. It appears, however, that she has already announced her intention to disinherit Amby, and has at no time bound herself to leave any portion of her property to Norval. She is left free to do as she pleases with it, and it is not entirely certain that her mother may not otherwise dispose of all or a substantial part of her estate, and leave little or nothing to defendant. The record is barren of fact or circumstance from which it can possibly be inferred that plaintiff is lacking in any of the natural instincts or affection of a mother for her child, nor do we find evidence to convince us that the effort made by her in this case to set aside the adoption paper was inspired by bitterness or resentment engendered by the marriage of her former husband to another woman, as suggested by counsel.

It is certain that the plaintiff will find it difficult, working as a domestic in a public place, to provide suitable clothing and education for Norval, and the influence sur-

rounding him in a hotel may not always be the best; but plaintiff has industry, health, and a strong desire to have him with her. By careful economy and proper care and attention, it is possible for her to give him a comfortable home and reasonable opportunities for the future. She has more interest in his well-being and will make greater sacrifices therefor than any other person, and we are reluctant to hold that the court, after finding that the agreement was obtained by fraud and should be canceled, abused its discretion in ordering the child returned to plaintiff.

4. APPEAL AND ERROR: questions of fact, verdicts, and findings: findings of trial court.

It is true that the case is triable *de novo* in this court, yet the finding of the trial court has generally been given considerable weight, in cases of this character. So much, as was said in *Smidt v. Benenga,* 140 Iowa 399, must depend upon the appearance and demeanor of the parties and the witnesses and all the facts appearing upon the trial that some weight must necessarily be given to the finding of the trial court. While the evidence is in many respects unsatisfactory, nevertheless, when considered as a whole, we are constrained to reach the conclusion that the decree of the court below should be affirmed, and it is so ordered.—*Affirmed.*

WEAVER, EVANS, and GAYNOR, JJ., concur.